# CITY of LITTLE ROCK  *v.*  Ronnie HUDSON

04-1350                                                236 S.W.3d 509

Supreme Court of Arkansas
Opinion delivered May 25, 2006

*Office of the City Attorney,* by: *Amy Beckman Fields,* Asst. City Att'y, for appellant.

*Robert A. Newcomb,* for appellee/cross-appellant.

TOM GLAZE, Justice. This is an appeal from the circuit court's reversal of the Little Rock Civil Service Commission's decision to uphold disciplinary action imposed on appellee Ronnie Hudson by the Little Rock Fire Department. Hudson is a thirty-two-year employee of the appellant Little Rock Fire Department ("Fire Department" or LRFD); he has been a captain for twenty-two years. The Fire Department has a drug and alcohol testing policy that requires employees to submit to random drug and alcohol tests. If an employee's test results show that he or she has a blood-alcohol content (BAC) of greater than .02%, the employee is subject to disciplinary action. On May 15, 2003, Hudson went to Southwest

Regional Medical Center for a random drug and alcohol test, as required by LRFD policies. Two breathalyzer tests revealed that Hudson's BAC exceeded the Fire Department's standards, and, as a result, the Fire Department suspended Hudson for thirty days and demoted him from the rank of captain to the rank of engineer.

Hudson appealed the Fire Department's disciplinary action to the Little Rock Civil Service Commission, which upheld the Fire Department's decision. Hudson then appealed the Commission's decision to Pulaski County Circuit Court. The circuit court held a hearing on March 19, 2004, and issued an order on April 9, 2004, reversing the Commission's decision and reinstating Hudson to the rank of captain. The LRFD filed a timely notice of appeal from the circuit court's decision, and now argues that the circuit court's decision was against the preponderance of the evidence; the Fire Department also raises an argument concerning the trial court's interpretation of Ark. Code Ann. § 5-65-207 (Supp. 2003). In addition, Hudson filed a notice of cross-appeal from the circuit court's decision to deny his request for attorney's fees.

As noted above, the proceeding underlying this appeal is a decision by the Little Rock Civil Service Commission. The circuit court reviews decisions of the Civil Service Commission *de novo* and has jurisdiction to modify the punishment fixed by the Commission even if the court agrees that the officer violated department rules and regulations. *City of Van Buren v. Smith*, 345 Ark. 313, 46 S.W.3d 527 (2001); *City of Little Rock v. Hall*, 249 Ark. 337, 459 S.W.2d 119 (1970). The circuit court does not merely review the decision of the Civil Service Commission for error, but instead conducts a *de novo* hearing on the record before the Civil Service Commission and any additional competent testimony that either party might desire to introduce. *Daley v. City of Little Rock*, 36 Ark. App. 80, 818 S.W.2d 259 (1991); Ark. Code Ann. § 14-51-308(e)(1)(c) (Repl. 2000). The effect of this statutory provision for a *de novo* appeal to circuit court is to reopen the entire matter for consideration by the circuit court, as if a proceeding had been originally brought in that forum. *Civil Service Commission of Van Buren v. Matlock*, 206 Ark. 1145, 178 S.W.2d 662 (1944). Although the transfer from a civil service commission is called an appeal in Ark. Code Ann. § 14-51-308(e)(1) (Supp. 2005), the circuit court proceeding is in the nature of an original action. *Daley, supra.*

This court then reviews the findings of the circuit court to determine whether they are clearly against the preponderance of

the evidence. *City of Van Buren v. Smith, supra; Tovey v. City of Jacksonville*, 305 Ark. 401, 808 S.W.2d 740 (1991). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Foundation Telecommunications v. Moe Studio*, 341 Ark. 231, 16 S.W.3d 531 (2000).

In its first point on appeal, the Fire Department argues that the circuit court's findings were clearly against the preponderance of the evidence. In reaching its conclusions, the circuit court both examined the record of the proceedings before the Civil Service Commission and heard additional witnesses. Thus, the evidence received in both proceedings is reviewed here.

As mentioned above, the Fire Department has a policy under which employees are subject to random drug and alcohol screenings; any employee who has a BAC over .02% is subject to discipline, given the safety-sensitive nature of such employment. Hudson was taken for his drug and alcohol test on May 15, 2002. Sheryl Richie, the nurse who administered the test, testified before the Commission that she was a certified breath alcohol technician as well as a certified factory authorized calibration technician. Richie stated that, on May 14, 2002, she performed an accuracy check on the breathalyzer machine used in Hudson's test; at that time, the machine was properly calibrated. She tested Hudson twice on May 15, 2002; the first test showed a BAC of .034, and the second test, conducted sixteen minutes later, showed a BAC of .028. Richie stated that, during the interval between tests, Hudson told her that he had consumed NyQuil the night before, but did not mention that he had also consumed alcohol the previous evening. On cross-examination, Richie stated that she was not aware that Hudson had anything in his mouth when he arrived to be tested, nor did she ask him whether he had anything in his mouth.

Dr. James Randall Baber, the medical review officer for the City of Little Rock, testified that he reviewed the records pertaining to Hudson's breathalyzer, as well as the blood test he subsequently took, and stated that the negative blood test was consistent with the positive results on the breathalyzer tests. Based on the average rate of alcohol metabolism, Dr. Baber opined that, for Hudson's BAC to have been .034 at 9:48 in the morning, his BAC would have to have been about .234 at 11:48 the previous evening. Dr. Baber also stated that, as of 9:48 a.m. on the morning of the test, he would have expected Hudson not to be exhibiting any

clinical symptoms of having consumed alcohol. He also noted that consuming NyQuil, which is ten percent alcohol, would increase one's blood alcohol level. On cross-examination, however, Dr. Baber conceded that there was "no way" that one's BAC could have been as high as .234 if one had consumed three glasses of an alcoholic beverage with an alcohol content of seven percent.

Hudson's wife, Bobby, testified that, on the evening before Hudson's breathalyzer tests, he had been upset about some harassment complaints that had been filed against him at work, so he had a few drinks from a bottle of pre-mixed screwdrivers. Mrs. Hudson said that Hudson drank two and a half glasses from the bottle. Before he went to bed around 11:00 p.m., Hudson said that he was going to take some NyQuil because he did not feel well. "When he got up the next morning around 5:45 a.m., he was fine," Mrs. Hudson said.

Numerous employees of the Little Rock Fire Department testified that they encountered Hudson on the morning of May 15, 2002, and none of them smelled an odor of alcohol on him or noticed that he was impaired in any way. In addition, Fire Department captain Steve Kotch testified that he and Hudson had conducted a training session for an athletic event, and Hudson was calculating split times with a stopwatch that morning. Kotch also said that Hudson was helping to reset the course after each run-through, which involved a lot of physical exertion.

Hudson testified at the Commission hearing, conceding that he had consumed two-and-a-half glasses of screwdrivers the night before his alcohol screening. He also said that when Chief Summerville came to get him to take him to the drug test, he was eating breath mints. When he got to the hospital, he had mints in his mouth, and he had them in his mouth the whole time he was blowing in the breathalyzer during the test. The nurse who conducted the test did not tell him that he should not have anything in his mouth during the test. After he failed the first test, Hudson told the nurse that he had not had any alcohol and asked whether the mints could have affected the test; she said that she did not know, but that she would test him again in fifteen minutes.

When Hudson took the second test, he failed it again. When he spoke to Chief Summerville about it, Hudson said that he did not know why, because he had not had any alcohol. Summerville refused to let Hudson drive himself after the test, so Hudson called his wife to come pick him up. Hudson then went to his doctor's

office, where he gave a blood sample to be tested for alcohol. Those test results were negative. Deborah Cordes, a lab technician at Hudson's physician's office, testified that she drew Hudson's blood around noon on May 15. Dr. Kevin Roberts, Hudson's doctor, testified that he conducted the blood test, which Dr. Roberts interpreted as being negative. On cross-examination, Dr. Roberts said that the "cut-off limit" for the blood test is .01, so any level of alcohol under that level would show up as a negative test.

Roger Hawk, Ph.D., a physical chemist, testified that the breath mints Hudson had been eating could have affected the results of the breathalyzer test, because the mints contain sorbitol, a form of alcohol. Dr. Hawk opined that if sorbitol were introduced into the machine used in Hudson's test, the sorbitol would measure on that machine. Dr. Hawk conceded on cross-examination, however, that he had not seen any studies where sorbitol presented a positive breathalyzer test result.

Dr. Alex Pappas, a professor at the University of Arkansas for Medical Sciences who is board-certified in chemical pathology, testified that, while breath tests are good screening tests, the performing of a second breath test at a later time would not confirm anything; in order to get a confirmation, he asserted, one had to perform a different kind of test. In addition, Dr. Pappas stated that for Hudson to have blown a .034 at 9:48 a.m., his BAC would have to have been .234 at 10:48 the previous evening. In order to achieve that high a BAC by drinking a pre-mixed alcoholic beverage that was seven-percent alcohol by volume, one would have to consume about ten or twelve drinks. The breath mints, in Dr. Pappas's opinion, were a reasonable cause for Hudson's .034, because it was impossible for him to have had such a high reading given the amount of alcohol he claimed to have consumed. Dr. Pappas also contended that Hudson could not have successfully completed the physical tasks he completed on the morning of May 15 if he truly had a BAC of .034.

The Fire Department called Rankine Forrester to give rebuttal testimony before the Commission. Forrester, the CEO of Intoximeter, Inc., the company that manufactured the breathalyzer in question, testified that he had personally tested his company's machines with various candies and gums that contained sorbitol, and none of them produced positive results on the type of machine used in Hudson's test. Forrester conceded, however, that he did not have a degree in any kind of science.

It was on the above-described testimony that the Commission upheld the Fire Department's decision to demote and suspend Hudson. At the hearing before the Pulaski County Circuit Court, the court reviewed the above evidence and heard additional testimony. Hudson submitted a videotaped deposition from Dr. Pappas, in which Dr. Pappas stated that the combination of breath mints and physical activity would "create the possibility of a false positive test using a breathalyzer." In addition, Dr. Pappas said that, given the eyewitnesses who averred that Hudson did not appear impaired the morning of his test, his activities, and the test methodology, he believed it "would be impossible to say that [the .034 was] an accurate reading given all of those circumstances."

Larry Tyner, the Assistant Fire Chief of Operations for LRFD, testified that out of the hundreds of people that the Fire Department had sent for alcohol and drug testing, he knew only of about three positive tests. He further stated that he had taken the breathalyzer test himself, and he believed that, because it takes such a forceful exhalation to make the machine work, it would be impossible to have a mint in one's mouth during the test and not blow it out. Current Fire Chief Rhoda May Kerr agreed with Tyner's testimony that there had only been about two positive tests out of thousands of drug and alcohol tests since 1999, and she stated her belief that, because of the very few number of positive tests, there was no need to follow up the breath test with a blood test in order to corroborate the positive results.

On the foregoing evidence, the circuit court reversed the decision of the Commission. In its order reinstating Hudson, the court noted that, in administering the breathalyzer, the hospital attendant did not inquire as to whether Hudson had anything in his mouth or whether, prior to the testing, he had eaten breath mints or taken NyQuil. "Without such an inquiry, the results of the breathalyzer are not reliable," the court concluded. In addition, the court noted that, although the machine used meets the requirements of the United States Department of Transportation, it is not on the list of DWI testing machines for the Arkansas Department of Health. Finally, the court pointed to Dr. Pappas's testimony that it was extremely unlikely that Hudson could have had a BAC greater than .02 at the time the test was given, based on Hudson's statement about how much he had to drink, and on the statements of co-workers about Hudson's performance of his duties up until the time the test was performed. Accordingly, the court reinstated Hudson to the rank of captain, voided the suspen-

sion, and ordered the Fire Department to pay Hudson the full amount of lost income attributed to his reduction in rank and his suspension.

On appeal, the Fire Department argues that the trial court's findings were erroneous in three following respects: 1) Hudson's breathalyzer results were unreliable because the attendant did not ask Hudson if he had eaten mints; 2) Hudson did not have a BAC in excess of .02; and 3) in basing its judgment on the administration of a breathalyzer, as opposed to a blood test.

Regarding the mints, the Fire Department argues that Richie's failure to ask Hudson if he had been eating mints could only have caused the results to be unreliable if Hudson actually had something in his mouth. That is, the LRFD contends, "[i]t is the presence of a substance in the mouth that would render the results unreliable, not the asking (or not asking) of the question." The Fire Department points to inconsistencies in Hudson's testimony, noting that at one point Hudson said he put mints in his mouth as he was on his way to the hospital, and elsewhere said that he ate the mints as he was taking the test. LRFD also relies on the testimony of Assistant Chief Tyner, who said it would be difficult to take a breathalyzer without spitting anything in one's mouth into the machine. The Fire Department also argues that Dr. Hawk, who testified that the sorbitol in the mints could have skewed the breathalyzer results, admitted that he had never seen any studies on the specific effects of sorbitol on a breath alcohol test; similarly, the Fire Department draws attention to Dr. Pappas's admission that he was unaware of any studies of the effects of breath mints on breathalyzers.

The gist of the Fire Department's arguments is essentially that Hudson's evidence regarding the existence or nonexistence of the mints, and the effects of the mints on the breathalyzer, was not credible. However, as noted above, the circuit court conducts a *de novo* review of the evidence, and on our review of the circuit court's findings, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Carson v. County of Drew*, 354 Ark. 621, 128 S.W.3d 423 (2003). Further, disputed facts and determinations of witness credibility are within the province of the fact-finder. *Id.* Although the Fire Department takes issue with the court's decision to give more credence to Hudson's testimony, it was within the court's province to do so.

■ The Fire Department next contends that the court erred in finding that Hudson did not have a BAC in excess of .02. On this issue, the Fire Department points to testimony regarding Hudson's appearance and demeanor on the morning of May 15. In addition, it charges that Dr. Pappas's testimony about Hudson's physical capability on that morning was undermined by Dr. Pappas's admission that he did not know how Hudson tolerates alcohol. Further, the Fire Department asserts that, because of the breathalyzer results and Hudson's testimony about his depressed emotional state the night before the test, Hudson's "testimony that he had two and one-half glasses of pre-mixed screwdriver lacks credibility." Again, however, the determination of credibility is left to the circuit court.

■ Finally, the Fire Department contends that the court erred in basing its judgment upon the administration of a breathalyzer, as opposed to a blood test. Here, the LRFD claims that the trial court clearly erred in "rel[ying] on Dr. Pappas's statement that a blood test is better evidence than a breathalyzer to determine blood alcohol content." The Fire Department points to discrepancies in Dr. Pappas's testimony, and notes that Fire Chief Rhoda May Kerr stated that there had only been two positive-for-alcohol tests since 1999. On the basis of this evidence, the Fire Department contends, the trial court erred in concluding that the breathalyzer was unreliable. Again, however, the Fire Department's argument amounts to little more than its disagreement with the circuit court's conclusions about the credibility of the witnesses and the weight to be given to their testimony. This is not a valid basis for reversal, and we therefore reject the LRFD's arguments on appeal.

In the Fire Department's second point on appeal, it contends that the trial court erred in considering the issue of whether the breathalyzer used to test Hudson is on the Arkansas Department of Health's list for DWI testing. Prior to the proceedings before both the Commission and the circuit court, Hudson filed a motion in limine seeking to exclude the results of the breathalyzer test under Ark. Code Ann. § 5-65-207 (Repl. 2005), which provides in pertinent part as follows:

> (a)(1) Every instrument used to determine the alcohol content of the breath for the purpose of determining if the person was operating a motor vehicle while intoxicated or with an alcohol

concentration of eight-hundredths (0.08) or more shall be so constructed that the analysis is made automatically when a sample of the person's breath is placed in the instrument, and without any adjustment or other action of the person administering the analysis.

. . . .

(b) Any breath analysis made by or through the use of an instrument that does not conform to the requirements prescribed in this section shall be inadmissible in any criminal or civil proceeding.

Hudson argued to both the Commission and the circuit court that the breathalyzer machine used in his test was not approved for use by the Arkansas Department of Health, and that therefore, under § 5-65-207(b), the results of the test were inadmissible against him.[1] At a pretrial hearing on the motion, the circuit court denied Hudson's motion. However, in its order reinstating Hudson, the trial court made the following finding:

The breathalyzer used meets the requirements of the United States Department of Transportation, but it is not on the Arkansas Department of Health's list for DWI testing, and the department does not have a list of approved breathalyzer machines for use in employee alcohol testing.

On appeal, the Fire Department concedes that the judgment "is not entirely clear as to the relationship between this finding by the trial court and the court's reversal of the disciplinary action imposed on Hudson." Nonetheless, the LRFD argues that the trial court erred in applying § 5-65-207 to this case, asserting that, although the trial court denied Hudson's motion, the court must have based its disregard of the breathalyzer results at least in part on Hudson's argument that § 5-65-207(b) precludes consideration of the breathalyzer.

It is unnecessary to address the merits of the Fire Department's argument in this point on appeal for two reasons; first, the

---

[1] In the proceedings before the Civil Service Commission, the Fire Department responded that the statute was irrelevant, because it was contained in the Omnibus DWI Act and had no applicability outside of prosecutions brought under that Act. The Commission denied Hudson's motion, finding that the proceedings were not a criminal matter, so whether the Health Department certified the machine was irrelevant.

trial court denied Hudson's motion in limine, thereby denying his request to exclude the breathalyzer test results altogether; and second, the court's ruling did not specifically provide that it was discounting the results because the machine was not certified or approved by the Arkansas Department of Health. Thus, the Fire Department has essentially received the relief it asked for when it requested that the court deny Hudson's motion. It is axiomatic that a party who received the relief requested has no basis for appeal. *See Jones v. State*, 326 Ark. 61, 931 S.W.2d 83 (1996); *Richmond v. State*, 320 Ark. 566, 899 S.W.2d 64 (1995).

■ We turn then to Hudson's cross-appeal, in which he argues that the trial court erred in granting the Fire Department's motion to modify the judgment and denying attorney's fees. In its original judgment, in addition to ordering Hudson's reinstatement and back pay, the trial court awarded Hudson costs, expenses, and attorney's fees. The Fire Department filed a motion to modify the judgment, citing *City of Little Rock v. Quinn*, 35 Ark. App. 77, 811 S.W.2d 6 (1991), and asserting that there was no statutory basis for the award of attorney's fees.[2] The court agreed and entered an amended judgment that awarded only costs and expenses.

*Quinn* was a supplemental opinion on denial of a petition for rehearing filed by the City of Little Rock. The case stemmed from the Little Rock Police Department's firing of Timothy Quinn; the Civil Service Commission upheld the firing, but the circuit court reversed and ordered Quinn reinstated with back pay. The city appealed, and Quinn cross-appealed, arguing that the circuit court erred in declining to award him attorney's fees. In the original, unpublished opinion, the court of appeals affirmed on both the direct appeal and cross-appeal. However, shortly after the court of appeals' original opinion, this court decided the case of *City of Fort Smith v. Driggers*, 305 Ark. 409, 808 S.W.2d 748 (1991), and held that a fireman, Driggers, who successfully sued the City of Fort Smith and its Civil Service Commission for failing to promote

---

[2] This court has consistently held that attorney's fees are not recoverable as an element of damages, except as specifically authorized by statute. *See, e.g., Shelter Mut. Ins. Co. v. Kennedy*, 347 Ark. 184, 60 S.W.3d 458 (2001); *Cotten v. Fooks*, 346 Ark. 130, 55 S.W.3d 290 (2001); *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990). Section 16-22-308 provides that a prevailing party may be allowed a reasonable attorney's fee "[i]n any civil action to recover . . . for labor or services, or breach of contract[.]"

him, was entitled to attorney's fees under Ark. Code Ann. § 16-22-308 (Supp. 1999). This was so because the recovery Driggers received was pay for "labor or services" he should have been allowed to perform had he been promoted.

In the supplemental *Quinn* opinion, however, the court of appeals distinguished *Driggers* on the grounds that, in *Driggers*, the employee brought a civil suit against the City that employed him; in Quinn's case, however, the proceeding was an appeal from a decision of the Civil Service Commission. Therefore, the court of appeals held, the action did not fit within the language of § 16-22-308.

On cross-appeal in the instant case, Hudson argues that *Quinn*, on which the circuit court relied, has been overruled by implication in cases such as *Love v. Smackover School District*, 329 Ark. 4, 946 S.W.2d 676 (1997). *Love* was a suit brought under the Arkansas Teacher Fair Dismissal Act, Ark Code Ann. § 6-17-1501 *et seq.* (Repl. 1993). In reversing the trial court's denial of attorney's fees, this court wrote that actions brought under the Fair Dismissal Act "are actions in contract for labor or services such that attorney's fees may be awarded by the trial court pursuant to § 16-22-308[.]" *Love*, 329 Ark. at 7. *See also Junction City School Dist. v. Alphin*, 56 Ark. App. 61, 938 S.W.2d 239 (1997) (an action under the Fair Dismissal Act is "both a civil action and a 'claim for labor or services' within [section] 16-22-308").

Hudson urges that his appeal from the Civil Service Commission was an action for labor or services, and that the statute governing such appeals contains language similar to that in the Fair Dismissal Act. Therefore, he contends, this court should extend the holding of *Love* and other Fair Dismissal Act cases to appeals from the Civil Service Commission. However, in concluding that an action under the Fair Dismissal Act was an action for which one could recover attorney's fees, the *Love* court pointed out that Love "*had a written contract with the school board* which entitled her to rights under the Teacher Fair Dismissal Act." *Love*, 329 Ark. at 7 (emphasis added). Thus, Love's action under the Act was an "action[ ] in contract for labor or services." *Id.*

Section 16-22-308 permits a prevailing party to recover attorney's fees "[i]n any civil action to recover on [a] . . . contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract[.]" Unlike Love, Hudson had no contract with the Fire Department. Accordingly,

we hold that the reasoning of *Love* is inapposite; further, under *Quinn*, Hudson is not entitled to attorney's fees because there is no statutory provision that would permit a recovery of such fees.

Affirmed.