SLIP OPINION  Cite as 2017 Ark. App. 412

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-16-471

| | |
|---|---|
| CITY OF LITTLE ROCK, LITTLE ROCK CIVIL SERVICE COMMISSION, and LITTLE ROCK FIRE DEPARTMENT<br>APPELLANTS | Opinion Delivered August 30, 2017<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SECOND DIVISION<br>[NO. 60CV-15-2916] |
| V. | HONORABLE CHRISTOPHER CHARLES PIAZZA, JUDGE |
| CHRIS MUNCY<br>APPELLEE | REVERSED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL |

**PHILLIP T. WHITEAKER, Judge**

This appeal arises from an action that was originally before the Little Rock Civil Service Commission ("the Commission"). The Little Rock Fire Department (LRFD) terminated the employment services of appellee Chris Muncy. Muncy appealed his termination to the Commission. The Commission upheld the termination, and Muncy appealed to the Pulaski County Circuit Court. The circuit court reversed the decisions of the LRFD and the Commission to terminate Muncy's employment. The appellants—the City of Little Rock, the Commission, and the LRFD—appeal the circuit court's decision. Muncy has filed a cross-appeal, asserting that the circuit court erred in declining to award him attorney's fees. We reverse on direct appeal and affirm on cross-appeal.



I.  *Background*

The LRFD, as an entity of the City of Little Rock, has the statutory authority to govern and regulate its employees. Arkansas Code Annotated section 14-51-302 (Repl. 2013) provides that "[a]ll employees in any fire . . . department . . . shall be governed by rules and regulations set out by the chief of their respective . . . fire departments after rules and regulations have been adopted by the governing bodies of their respective municipalities." In 2012, the LRFD issued a policy memorandum declaring that any uniformed employee of the LRFD who tested positive for illegal or controlled drugs would be terminated. Specifically, the policy provided as follows:

> Uniformed members of the Little Rock Fire Department can most easily describe this policy statement as the standard regarding the use of alcohol or illegal or controlled drugs. Illegal or controlled drugs include but are not limited to: anabolic steroids, amphetamines, barbiturates, benzodiazepine, metabolites, cocaine metabolite, methadone, methaqualone, opiates, PCP, propoxyphene and THC metabolite. ⋆*This list is not all inclusive; employees may be screened for additional substances as determined by the Fire Chief and could include drugs designated as controlled substances in the Arkansas Criminal Code as may be amended from time to time.*

> . . . .

> A uniformed Little Rock Fire Department employee with a verified positive drug result confirmed by a Medical Review Officer (MRO) shall be <u>terminated.</u>

(Emphases in original.)

After the policy was issued, the LRFD developed a protocol for its implementation. Each month, the LRFD chooses seventeen employees at random to be drug-screened. The selected employees each provide a urine sample. The urine sample is screened utilizing an Enzyme Multiplied Immunoassay Test (EMIT).   If a positive result is obtained, the urine

sample is forwarded for a different confirmatory test—a chromatographic- and mass-spectrometer-based test (GC/MS)—which analyzes the sample at a molecular level. If a sample tests positive for methamphetamine, the toxicology lab will then conduct an isomer test to determine the ratio of D-methamphetamine (the illicit form of methamphetamine) to L-methamphetamine (a variant with little stimulatory effect that is the active ingredient in Vicks inhalers). If the D-form of methamphetamine is greater than 20%, the test will be considered positive for D-methamphetamine.

On July 22, 2014, Muncy was randomly selected to be drug-tested. On the initial test, his urine sample was positive for amphetamine and methamphetamine, with a result of 222.[1] Because of the positive result, the LRFD followed its protocol and requested a confirmatory screening by GC/MS test. The GC/MS testing of Muncy's urine sample indicated a methamphetamine concentration of 17,138 nanograms per milliliter (ng/ml) and an amphetamine concentration of 2,894 ng/ml.[2] Because of that positive result, an isomer test was conducted to determine the ratio of D-methamphetamine to L-methamphetamine. Muncy's sample was 85% D-form and 15% L-form. Based on the results of Muncy's drug screen,[3] the LRFD terminated his employment.

---

[1]A completely clean sample will have a value of –100, and anything over zero is considered positive.

[2]The GC/MS test's cutoff for a positive test is 500 ng/ml.

[3]Muncy, who denied ever taking methamphetamine, subsequently sought additional testing at his own expense. His independent test, however, was also positive for methamphetamine.

Muncy appealed his termination to the Commission, which voted to uphold Muncy's termination. Muncy then appealed the Commission's decision to the Pulaski County Circuit Court pursuant to Arkansas Code Annotated section 14-51-308(e)(1) (Repl. 2013). Although this statute provides for an appeal from a civil service commission, the circuit court proceeding is in the nature of an original action. *Daley v. City of Little Rock*, 36 Ark. App. 80, 818 S.W.2d 259 (1991). The circuit court does not merely review the decision of the civil service commission for error, but instead conducts a de novo hearing on the record before the civil service commission and any additional competent testimony that either party might desire to introduce. *Id*. Here, the circuit court both considered the transcript of the proceedings before the Commission and took additional testimony. We will discuss the testimony and evidence before the Commission as it was presented before the circuit court.

The LRFD presented evidence of the reasons for its drug policy. Gregory Summers, fire chief of the LRFD since 2009, explained that the reason for the policy was due to the "safety sensitive work" of the LRFD, stating that "we definitely don't want anybody operating our equipment that's under the influence of any type of drug." Summers further noted that firefighters "have a responsibility not only to the citizens that they're there to protect, but also to their co-workers. . . . Other firefighters need to be able to trust each other with their lives." Summers also testified that he would be uncomfortable reinstating a firefighter who had tested positive for drug use. He stated that it would "send a bad message to every other firefighter. . . . If an exception is made for Mr. Muncy, it destroys the policy, and if that's the case, then we shouldn't even have one." Summers pointed out that he had

fired other firefighters who had positive drug tests, including one who tested positive for marijuana after attending a "hookah" party, even though that firefighter claimed he did not know what was in the hookah. Summers explained, "So intentional [or] unintentional, he tested positive for drugs and was terminated." Assistant Chief of Operations Douglas Coney added that the policy was "basically a zero-tolerance policy, [and] if you flunked it, whether it's a listed drug or not, you're fired."

Both the LRFD and Muncy presented testimony concerning the drug testing that led to Muncy's termination. Brent Staggs, a medical review officer, testified for the LRFD. Staggs reviewed Muncy's drug test and a list of prescription medications that Muncy was taking. Staggs acknowledged that Muncy had a prescription for a Vicks inhaler. According to Staggs, however, the Vicks inhaler contained only the L-isomer of methamphetamine and not the D-isomer. Staggs testified that the Vicks inhaler thus could not explain Muncy's positive drug test. In fact, Staggs did not see any prescription on Muncy's list of medications that would contain the D-isomer and that would explain Muncy's positive test for methamphetamine.

Similarly, Staggs noted that Muncy had a prescription for Adderall, which could show up on a drug test as amphetamine. Staggs opined that this would explain Muncy's positive result for amphetamine; he testified, however, that although methamphetamine can break down into amphetamine, "amphetamine can never turn into methamphetamine." Staggs said he was unable to find any medical explanation for Muncy's results. Staggs also pointed out that the amount of methamphetamine in Muncy's sample—more than 17,000 ng/ml—was

"fairly high." Given that anything over 500 ng/ml is positive, Staggs pointed out that Muncy was thirty times over the cutoff.

In response to this testimony, Muncy presented the testimony of Dr. Alex Pappas. Dr. Pappas said that when he was contacted to testify, he was told there was something wrong with the test, but he could not find anything wrong with it, saying it was "scientifically a good-looking test." Dr. Pappas acknowledged that the test had been properly confirmed, but he was bothered by its inconsistency with Muncy's history and his past behavior. He suggested that it was possible that Muncy "could have only recently started using methamphetamine," and it was "possible he could be the unlucky guy who got tested not long after he started a new drug." Dr. Pappas opined that the supplements Muncy used to increase his sex drive would "probably not be something he could have ordered on the internet that has a derivative of methamphetamine in it."

Muncy also presented testimony concerning his character. Muncy testified about his employment history, noting that he had been in the Navy, had been a commercial diver for a nuclear power plant, and had worked as an EMT. He said that he had never failed a drug test at any previous place of employment. He adamantly denied ever taking methamphetamine, although he conceded that he had been taking testosterone injections for a while to enhance his sex life. He could not deny the positive drug test, however, and he could offer no explanation for it. Muncy called several witnesses on his own behalf, including his captain, several fellow firefighters, and friends. Each one testified that Muncy gave no indication in his behaviors or actions that he was on methamphetamine or any other kind of

drug. His coworkers testified that they had never seen him do anything or behave in any way that caused them to fear for their safety. Even Assistant Chief Coney agreed that Muncy was a good firefighter, and Chief Summers acknowledged that he had been shocked when he heard that Muncy had tested positive and said that he had no indication from Muncy's behavior or demeanor that he was on methamphetamine.

At the conclusion of the trial, the court ruled from the bench that Muncy's positive drug test was "pretty obvious and it's conclusive." The court questioned, however, whether the "situation [was] so severe . . . that the zero tolerance policy is justified." The court stated that it understood the purpose of the policy, but given Muncy's history and good character, it concluded that the sanction of termination was too severe. The court therefore determined that a thirty-day suspension and demotion from the rank of apparatus engineer to that of firefighter would be appropriate.

An order to that effect was entered shortly thereafter. In addition to the thirty-day suspension and demotion, the court also ordered the LRFD to pay Muncy back pay in the amount of $44,376.23. The LRFD filed a timely notice of appeal, and Muncy filed a timely notice of cross-appeal.

II. *Standard of Review*

The supreme court explained the process for reviewing appeals that arise from actions before the civil service commission in *City of Little Rock v. Hudson*, 366 Ark. 415, 236 S.W.3d 509 (2006), as follows:

> As noted above, the proceeding underlying this appeal is a decision by the Little Rock Civil Service Commission. The circuit court reviews decisions of the Civil

SLIP OPINION

SLIP OPINION

Service Commission de novo and has jurisdiction to modify the punishment fixed by the Commission even if the court agrees that the officer violated department rules and regulations. *City of Van Buren v. Smith*, 345 Ark. 313, 46 S.W.3d 527 (2001); *City of Little Rock v. Hall*, 249 Ark. 337, 459 S.W.2d 119 (1970). The circuit court does not merely review the decision of the Civil Service Commission for error, but instead conducts a de novo hearing on the record before the Civil Service Commission and any additional competent testimony that either party might desire to introduce. *Daley v. City of Little Rock*, 36 Ark. App. 80, 818 S.W.2d 259 (1991); Ark. Code Ann. § 14-51-308(e)(1)(c) (Repl. 2000). The effect of this statutory provision for a de novo appeal to circuit court is to reopen the entire matter for consideration by the circuit court, as if a proceeding had been originally brought in that forum. *Civil Service Commission of Van Buren v. Matlock*, 206 Ark. 1145, 178 S.W.2d 662 (1944). Although the transfer from a civil service commission is called an appeal in Ark. Code Ann. 14-51-308(e)(1) (Supp. 2005), the circuit court proceeding is in the nature of an original action. *Daley*, *supra*.

This court then reviews the findings of the circuit court to determine whether they are clearly against the preponderance of the evidence. *City of Van Buren v. Smith*, *supra*; *Tovey v. City of Jacksonville*, 305 Ark. 401, 808 S.W.2d 740 (1991). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Foundation Telecommunications v. Moe Studio*, 341 Ark. 231, 16 S.W.3d 531 (2000).

*Hudson*, 366 Ark. at 417–18, 236 S.W.3d at 512.

## III.  *The LRFD's Appeal*

On appeal, both parties concede that the circuit court had the jurisdiction to modify the punishment meted out by the Commission. The LRFD, however, argues that the circuit court's decision to overturn Muncy's termination vitiates its zero-tolerance drug policy and was therefore clearly erroneous. In support of its argument, the LRFD cites *City of Little Rock v. Bates*, 270 Ark. 860, 607 S.W.2d 68 (Ark. App. 1980). In *Bates*, police officer Bill Bates was discharged from the Little Rock Police Department after the department determined that he had violated numerous sections of its rules and regulations. The Civil Service Commission upheld the termination, but the Pulaski County Circuit Court ordered Bates to be reinstated.



On appeal, our court held that the circuit court's decision was clearly erroneous. Specifically, our court noted that there was uncontroverted evidence that Bates had violated the police department's rules and regulations on multiple occasions. Because the evidence clearly demonstrated that Bates had violated the department's policies, we held that the circuit court's decision was not supported by substantial evidence. *Bates*, 270 Ark. at 866–67, 607 S.W.2d at 71–72.

Muncy, in turn, maintains that the circuit court could easily have concluded that termination was too harsh a sanction. He relies on *City of Little Rock v. Hall*, 249 Ark. 337, 459 S.W.2d 119 (1970). In *Hall*, police officer Lester Hall was terminated by the Little Rock Police Department for slapping a prisoner. The Commission upheld his termination, but the Pulaski County Circuit Court reduced that sanction to a thirty-day suspension. The supreme court upheld the circuit court's decision, primarily because the officer had an exemplary service record, there was no evidence that he had struck the prisoner with anything other than an open fist, and he had had previous encounters with the same prisoner "without unusual event." *Hall*, 249 Ark. at 340, 459 S.W.2d at 121. Muncy posits that the same result should be reached in his case.

We disagree that either case is controlling in the present appeal because neither *Bates* nor *Hall* involved a zero-tolerance policy like the one promulgated by the LRFD.[4] Rather, we consider the facts of this case to be more analogous to the fact situation described in *Petty*

---

[4]In fact, our research did not reveal a civil service commission appeal in Arkansas specifically involving a zero-tolerance drug policy like the one in this case.

*v. City of Pine Bluff*, 239 Ark. 49, 386 S.W.2d 935 (1965). There, the City of Pine Bluff had an ordinance requiring that all members of its fire department live within the city limits or in sufficiently close proximity thereto. The appellant, Petty, was indefinitely suspended from the Pine Bluff Fire Department for moving outside the city limits in violation of the ordinance.[5] The supreme court affirmed Petty's suspension, finding the evidence was overwhelming that Petty had violated the fire department's policy to which no previous exceptions had been allowed. *Petty*, 239 Ark. at 53–54, 386 S.W.2d at 938. While we find that *Petty* is helpful, it is nonetheless not an appeal dealing with a zero-tolerance drug policy.

As stated earlier, we use a clearly erroneous standard of review in appeals from a civil service commission. We review the circuit court's findings to determine whether they are clearly against the preponderance of the evidence. *See City of Van Buren*, *supra*. In the present case, the circuit court made a factual finding that acknowledged the overwhelming evidence of Muncy's positive tests for methamphetamine; indeed, the scientific evidence supporting that finding was uncontroverted.[6] The court stated that it understood the purpose of the policy, but it questioned whether the "situation [was] so severe given that test that the zero tolerance policy is justified" based on Muncy's history and good character. We cannot agree. The LRFD has the authority to govern and regulate its employees. Ark. Code Ann. § 14-51-302. The LRFD provided legitimate public-policy reasons behind its zero-tolerance policy

---

[5]Petty built a house six miles outside of the city limits after that ordinance went into effect, but he signed a statement averring that he was a resident of Pine Bluff, using his brother's address as his own.

[6]The circuit court even noted that the concentration of methamphetamine in Muncy's sample was "a fairly high level."

on drug usage and the necessity for consistency in the application of that policy. Muncy, despite his good reputation, clearly violated the policy. We are thus left with a definite and firm conviction that a mistake has been made, *see Hudson*, *supra*, and we therefore reverse the circuit court's reversal of Muncy's termination.

## IV. *Muncy's Cross-Appeal*

In his cross-appeal, Muncy argues that the circuit court should have awarded him attorney's fees. Arkansas Code Annotated section 14–51–308(e)(1)(B)(iv) (Repl. 2013) provides that where an appeal is taken from the civil service commission to circuit court, the circuit court may award reasonable attorney's fees to the prevailing party. As we have reversed the circuit court's decision, Muncy is no longer the prevailing party, and his argument is therefore moot.

Reversed on direct appeal; affirmed on cross–appeal.

GLOVER and HIXSON, JJ., agree.

*Amy Beckman Fields*, Office of the City Attorney, for appellants.

*Robert A. Newcomb*, for appellee.