Cite as 2025 Ark. App. 1

# ARKANSAS COURT OF APPEALS

DIVISION II
NO. CV-23-226

| | |
|---|---|
| CITY OF LITTLE ROCK AND THE LITTLE ROCK POLICE DEPARTMENT<br><br>APPELLANTS<br><br>V.<br><br>CHARLES STARKS<br>APPELLEE | Opinion Delivered January 8, 2025<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTH DIVISION<br>[NO. 60CV-19-7042]<br><br>HONORABLE TIMOTHY DAVIS FOX, JUDGE<br><br>AFFIRMED |

**STEPHANIE POTTER BARRETT, Judge**

This is the second appeal by the City of Little Rock and the Little Rock Police Department (collectively, "Little Rock") regarding the termination of Charles Starks, a Little Rock police officer, after he fatally shot Bradley Blackshire in the line of duty. The Little Rock Civil Service Commission ("Commission") terminated Starks's employment because it determined that Starks had violated General Order 303.II.E.2 ("General Order"), which provides, "Officers will not voluntarily place themselves in a position in front of an oncoming vehicle where Deadly Force is the probable outcome. When confronted by an oncoming vehicle, officers will move out of its path, if possible, rather than fire at the vehicle." Little Rock Police Department General Order No. 303.II.E.2 (2017). Starks appealed his termination to the Pulaski County Circuit Court, which affirmed the

Commission's finding that he had violated the General Order but reversed the Commission's termination decision, instead reducing Starks's salary and ordering a thirty-day suspension. In its decision, the circuit court divided Starks's actions during the encounter into nonemergency and emergency portions, finding Starks had violated the General Order during the nonemergency portion but not during the emergency portion. In making its decision, the circuit court analyzed Starks's actions using a reasonableness standard.

Little Rock appealed the circuit court's decision to this court, arguing on direct appeal that the termination of Starks's employment should stand; Starks cross-appealed, asserting that he had not violated the General Order, and therefore, no punishment was warranted. In *Little Rock Police Department v. Starks*, 2021 Ark. App. 323 (*Starks I*), this court reversed and remanded the case to the circuit court, holding that the case was

> simply a question of whether General Order 303.II.E.2 was violated, and that question must be analyzed under the voluntariness of the act, not a reasonableness standard as used by the circuit court. Therefore, there is no need to divide the situation into emergency or nonemergency situations nor to determine whether the actions were reasonable for an officer with similar training and experience. Simply posed, did Starks voluntarily violate General Order 303.II.E.2 by placing himself in a position in front of an oncoming vehicle where deadly force was the probable outcome?

2021 Ark. App. 323, at 5.

In an order filed on January 19, 2023, the circuit court stated that it had conducted a de novo review of the record, it specifically found that Starks did not voluntarily place himself in a position in front of an oncoming vehicle in violation of the General Order, and

it reversed Starks's termination, reinstating him effective May 6, 2019, and ordering that Starks be paid all salary as well as payment of or reimbursement for all benefits due him from May 6, 2019, through the implementation of the order.

Little Rock appeals, arguing that (1) the circuit court's determination that Starks did not violate the General Order is against the preponderance of the evidence and clearly erroneous; and (2) its decision to overturn Starks's termination and order reinstatement was also against the preponderance of the evidence and clearly erroneous because Starks violated the General Order, and the death of a civilian resulted because of that violation. We affirm the circuit court's decision that Starks did not violate the General Order.

I. *Facts*

The facts of this case were set forth in *Starks I*:

Charles Starks is a certified law enforcement officer who began working as a patrol officer in the Little Rock Police Department in approximately August 2013. On Friday, February 22, 2019, Starks was working patrol when he received notification of a stolen vehicle in the area of 12th Street and Rodney Parham, responded to the call, and traveled to that general area. He was subsequently notified that the stolen vehicle had made a left turn into a parking lot near 7305 Kanis Road and that the operator of the stolen motor vehicle had backed the car into a parking space and was stationary. Starks was informed that Officer Zebulum Tyler was en route to assist him and was "gonna be a minute" before arrival. Starks specifically parked his patrol car in front of the stolen vehicle, partially blocking the vehicle in such a manner that the operator of the stolen vehicle still had room to flee.

The video footage of the incident shows that at approximately 1109 hours, Officer Starks exited his patrol car, passed in front of the stolen vehicle, and approached the driver's side door with his weapon drawn. Starks ordered the driver to show his hands, roll the window down, and exit the vehicle. The driver did not comply with Officer Starks's commands. Testimony by Officer Starks indicated that he saw the suspect reach over and put the car into gear. Officer Starks then saw the suspect reach down near his leg to an area that Officer Starks could not see. Officer

3

Starks believed that the driver, Bradley Blackshire, was reaching for a gun. Officer Starks continued to give Blackshire commands as he walked backward and positioned himself near the front driver's door panel. Blackshire turned to avoid hitting the patrol car and attempted to flee. In this process, Blackshire hit the officer with the car, injuring his knee and causing him to stumble backward. Starks fired three to four rounds at the driver. The stolen vehicle paused briefly and then began moving again. Starks testified that he attempted to seek cover from his car, and as he moved from his position toward his car, he was directly in front of the stolen vehicle. When the stolen vehicle began moving forward again, Starks ended up on the hood of the stolen vehicle, and from there, he fired an additional ten to eleven rounds at Blackshire. Blackshire died as a result of the gunshot wounds sustained during the incident.

2021 Ark. App. 323, at 1–2.

## II. *Standard of Review*

A city or employee has the right to appeal any decision of the Civil Service Commission to the circuit court within whose jurisdiction the commission is situated. Ark. Code Ann. § 14-51-308(e)(1)(A) (Supp. 2019). The circuit court reviews decisions of the Civil Service Commission de novo and has jurisdiction to modify the punishment fixed by the commission, even if the circuit court agrees that the officer violated department rules and regulations, and even if the evidence it relies on in modifying the punishment was not presented to the Commission. *Little Rock Police Dep't v. Phillips*, 2017 Ark. App. 410, 526 S.W.3d 872. The circuit court does not merely review the Commission's decision for error but instead conducts a de novo hearing on the record made before the Commission and any additional competent testimony required by either party. *Sears v. City of Hot Springs*, 2020 Ark. App. 247, 601 S.W.3d 426. Our supreme court has held that the effect of a de novo appeal from the Commission to the circuit court is "to reopen the entire matter for

4

consideration by the circuit court, as if a proceeding had been originally brought in that forum. Although the transfer from a civil service commission is called an appeal in Ark. Code Ann. § 14-51-308(e)(1) (Supp. 2005), the circuit court proceeding is in the nature of an original action." *City of Little Rock v. Hudson*, 366 Ark. 415, 417, 236 S.W.3d 509. 511–12 (2006) (citations omitted).

This court reviews the findings of the circuit court to determine whether they are clearly against the preponderance of the evidence. *Parker v. City of Litle Rock*, 2024 Ark. App. 466, 699 S.W.3d 401. Disputed facts are within the province of the fact-finder, and due deference is given to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Phillips*, *supra*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Sears*, *supra*.

III. *Little Rock Police Department Reports*

Sergeant J.B. Stephens authored a memorandum as a result of an internal affairs investigation of the incident.[1] Although Stephens recommended that the finding Starks

---

[1]Stephens's memorandum also reviewed the actions of Officer Michael Simpson, the first officer to arrive on scene after the incident, regarding his use of deadly force by ramming his police cruiser into the stolen vehicle due to his belief that Starks was in imminent danger of being run over. Although General Order 303 section III.J specifically prohibits use of a police vehicle in that manner, Stephens noted that General Order 104 section III.B authorizes officers to deviate from General Orders if circumstances require, and he concluded that the circumstances justified a deviation because Simpson had used the only weapon at his immediate disposal capable of stopping a moving vehicle. The report further excused Simpson's use of profane language during the encounter; while "technically" a

5

violated the General Order be sustained, he noted that Starks, who was at the side of the stolen vehicle when he ordered Blackshire to show his hands—commands that Blackshire ignored—began to back away from the stolen vehicle when he noticed that it was slowly moving forward and turning left. Blackshire's actions prompted Starks to reposition himself toward the front left quarter panel of the stolen vehicle and continue to move backward beside it, all while still issuing verbal commands for Blackshire to stop. Blackshire "bumped" Starks with the stolen vehicle, at which time Starks fired three shots into the windshield. The stolen vehicle stopped momentarily, and Starks attempted to make it to his police cruiser for hardcover because he saw Blackshire reach for what he thought was a gun, and he feared Blackshire was armed and was about to open fire. Starks ended up on the hood of the stolen vehicle when it began moving forward again, and Starks fired an additional eleven rounds into the vehicle. Stephens did not find Starks's explanation that he could not move toward the rear of the stolen vehicle because there was no cover for him to be credible.

Assistant Police Chief Hayward Finks recommended that Starks be exonerated, stating that he did not believe Starks intentionally or voluntarily stepped in front of the vehicle driven by Blackshire, but rather, Blackshire's action forced Starks to seek cover out of fear he was about to be shot. Captain Heath Helton, who also recommended that Starks be exonerated, noted that the chain of events occurred very quickly; Starks had to make a split-second decision when he decided to use deadly force; and the entire incident was "one

_____

violation of the rules and regulations, Stephens did not recommend that a violation be sustained against Simpson.

6

continuous event" of deadly force. Lieutenant Dana Jackson also opined that Starks should be exonerated, stating that while Starks did violate "the letter of [the General Order]," it was done "with the intent to reach what he feels is his best position of cover as he sees it, not with the intent of forcing a deadly force encounter." Sergeant Harold Scratch opined that Starks was unable to reach his patrol car due solely to Blackshire's actions.

IV. *Testimony Before the Commission*

Starks testified before the Commission that he parked his patrol vehicle partially blocking the front of the stolen vehicle. When he got out of his patrol vehicle, he gave Blackshire numerous commands to show his hands, which Blackshire refused to do. Starks explained that, for his safety, he was taught to position himself so that he could always see a suspect's hands; for that reason, he exited his patrol vehicle and positioned himself square to the driver's-side door, maximizing coverage for his protective vest and in position to observe Blackshire's hands. Starks saw Blackshire move his right hand onto the gearshift, put the vehicle in drive, and then move his right hand down toward his thigh or waist area; he could not tell if Blackshire was reaching for something, including a gun. Blackshire began slowly driving toward Starks, who continued walking alongside the quarter panel and behind the front roof pillar on the driver's side. Starks testified that his left leg was hit by the stolen vehicle, and he continued to step back. The stolen vehicle continued to proceed toward him and struck him a second time, at which time he felt pain, and he fired his service weapon. Starks testified that he knew he had to get to cover, or he was going to be run over, shot, or both. He explained that for a fraction of a second after the first volley of rounds, the stolen

7

vehicle paused, and that was when he stepped in front of it, not to continue deadly force but to get to secure cover behind his patrol car. Starks said the stolen vehicle's pause was very short, it then continued forward once he was in front of it, and he continued to fire his weapon. When asked why he continued to fire, Starks stated that he was absolutely convinced he was going to be run over. Starks believed he had no other option but to step in front of the vehicle because he had no option to secure cover other than behind his patrol car as he had been trained to do. Starks was concerned that if he remained by the driver's door and Blackshire displayed a weapon, which would require him to fire his service weapon, Blackshire's passenger was likely to be struck by a bullet. Starks agreed he knew that if Blackshire was going to escape, he would have to turn the vehicle left where he was standing, and he moved in the direction the car had to move. Starks explained that because he believed there was a gun in the car, he moved toward the front of the stolen vehicle in an attempt to get back to his patrol car for cover from possible gunfire when the stolen vehicle, which had previously begun to move, paused for a brief second because there was no other route to get to his patrol car. Starks testified he could not have moved toward the back of the stolen vehicle and away from the vehicle's forward movement because he would not have been able to see the driver's hands, even though it would have been more difficult for the driver to shoot at him over his shoulder. Starks believed the only way to get to cover after the vehicle started moving was to go around the front of the moving vehicle. Starks said that when the stolen vehicle briefly paused, he believed it was stopping; he believed Blackshire could still have a firearm, and his intent was to get behind his patrol car's engine block for cover. Starks

testified that he did not jump onto the hood of the stolen vehicle; once he crossed in front of the vehicle, it moved and struck him again, and he leaned forward as he was firing because he feared that the vehicle would continue to push against him, and he would be run over.

Officer Wayne Kelly opined that Starks was in less danger of facing deadly force if he had been positioned at the back of the vehicle when it began to move forward. Police Chief Keith Humphrey stated that had Starks remained at the side of the stolen vehicle or had he moved to the back corner of the vehicle, he would not have been in the path of the oncoming vehicle; instead, he voluntarily placed himself in front of the vehicle and made no effort to move out of the vehicle's path. Sergeant Stephens testified that Starks's stated reasoning for moving toward the front of the stolen vehicle—to secure cover behind his patrol vehicle because he believed Blackshire had a gun—twice placed Starks in danger because he passed in front of a vehicle in which he believed the driver had a gun; he would have only had the gun to worry about had he stepped in the opposite direction, and it was not reasonable to choose to move into an area of known mortal danger as opposed to moving to an area with potential mortal danger.

Assistant Chief Alice Fulk believed that Starks violated the General Order but not as to the first three or four shots fired by him because they were fired from the side of the vehicle before he crossed in front of the oncoming vehicle. In Fulk's opinion, the policy was not applicable while the first three or four rounds were fired, and Starks's moving in front of the vehicle was a secondary action because the most impactful event of the initial gunshots had already occurred. Assistant Chief Finks testified that he interpreted the intent of the

policy to mean an officer would not intentionally stand in front of an oncoming vehicle and have no other option but to use deadly force. Captain Helton opined that because Starks was initially by the driver's door when he fired his first shots, the move to the front of the stolen vehicle was a continuation of what had already started; and because deadly force had already taken place, the policy did not fit the situation.

Officer Simpson agreed there was a greater chance that Starks would be shot in front of the stolen vehicle, but he also stated there was a significant concern that Starks would be hit if he had gone behind the vehicle because Blackshire could have placed the vehicle in reverse and run over him. Sergeant Tori Trammell testified that moving toward the back of the stolen vehicle would provide no cover, and Starks would be an open target; after the stolen vehicle began moving toward Starks, there was no other cover available to him other than his patrol vehicle. Trammell opined that the policy addressed voluntarily placing oneself in front of a vehicle and staying there if it was possible to move elsewhere and not intentionally place oneself in danger. Officer Heath Atkinson testified that Starks appeared to have been hit by the front wheel of the stolen vehicle being driven by Blackshire, lost his balance, stumbled back, and the vehicle turned into Starks; he did not think it was voluntary if Starks was hit by the vehicle and was falling backward. Atkinson admitted it was not safer for Starks to try to cross in front of the stolen vehicle as it was moving forward rather than move to the rear of it, but he still believed Starks's movement in front of the vehicle was involuntary. Lieutenant Dana Jackson testified that he did not believe Starks voluntarily

moved in front of the vehicle. Officer John Holt testified that he saw nothing in Starks's actions that violated policy.

V. *Discussion*

The controlling issue in this case is whether Starks's actions were *voluntary* as that language is used in the General Order. Of importance here, the General Order does not define voluntary. Although the circuit court concluded that Starks did not violate the General Order, the circuit court did not define voluntary. While the parties disagreed on the definition of the word voluntary as used in this General Order, they conceded at oral argument that neither party asked the circuit court to make that finding.

Regardless of the circuit court's failure to define voluntary, our court presumes that in the absence of a showing to the contrary, the circuit court acted properly and made the findings of fact necessary to support its judgment. *Am.'s Pre-Owned Selection, LLC v. Williams*, 2021 Ark. App. 67. When construing a general order, we use the same means and canons of construction used to interpret statutes. *See State ex rel. Rutledge v. Purdue Pharma L.P.*, 2021 Ark. 133, at 8–9, 624 S.W.3d 106, 110; *Tollett v. Wilson*, 2020 Ark. 326, at 6, 608 S.W.3d 602, 606. The principal rule of statutory construction is to construe a statute just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* When the language is plain and unambiguous, there is no need to resort to rules of statutory construction, and the analysis need go no further. *Advance Fiberglass, LLC v. Rovnaghi*, 2011 Ark. 516, at 4. We do not find that "voluntarily" as used in the General Order is ambiguous. The ordinary and usually accepted meaning on voluntary is "proceeding from one's own free

11

choice or consent rather than as the result of duress, coercion, or deception." https://www.merriam-webster.com/dictionary/voluntary (accessed Dec. 12, 2024). The circuit court found that Starks did not voluntarily place himself in front of Blackshire's vehicle. We presume that the circuit court made findings of fact necessary to support its judgment, and the circuit court found specifically that Starks did not place himself in front of a moving vehicle of his own free choice; rather, his actions were taken under duress, and he believed he had no choice in the matter if he was going to seek the only cover available to him—his patrol vehicle. Given our standard of review and the deference we afford the circuit court in assessing witness credibility, we hold that the circuit court's finding that Starks did not violate the General Order is not clearly erroneous.

Little Rock also argues that the circuit court's decision to overturn Starks's termination was clearly against the preponderance of the evidence, especially in light of the fact that Starks's actions resulted in the death of a civilian. It is unnecessary to address this point since it is moot given the disposition of the first point of appeal.

Affirmed.

HIXSON and BROWN, JJ., agree.

*Friday, Eldredge & Clark, LLP*, by: *Michael S. Moore* and *Khayyam M. Eddings*, for appellants.

*Robert A. Newcomb* and *Lance LoRusso*, for appellee.